❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>A purple and pink iPhone (item #2) and a black<br>Samsung smartphone (item #3), currently located<br>at 515 W. Moreland Blvd., Waukesha, WI 53188 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 25-956M(NJ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before    8/18/2025    *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    Honorable Nancy Joseph    .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*    ❏ until, the facts justifying, the later specific date of _____.

Date and time issued:    8/4/2025 @ 2:03 p.m.

*Judge's signature*

City and state:    Milwaukee, Wisconsin          Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name(s) of any person(s) seized: |
|---|

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A

The property to be searched is described as follows:

  a.  A Purple and Pink iPhone smartphone, (item #2), hereinafter "**Device A;**"

  b.  A Black Samsung smartphone, (item #3), hereinafter **"Device B;"**

**Devices A and B**, collectively the "**Devices,**" are currently located at 515 W. Moreland Blvd., Waukesha, Wisconsin 53188. This warrant authorizes the forensic examination of the **Devices** for the purpose of identifying the electronically stored information described in Attachment B.

57

Case 2:25-mj-00956-NJ  Filed 08/04/25  Page 3 of 63  Document 1

<u>**ATTACHMENT B**</u>

1.      All records on the **Devices** described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, 18 U.S.C. § 2 including, but not limited to:

    a.  lists of customers and related identifying information;

    b.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    d.  any information recording schedules or travel;

    e.  all bank records, checks, credit card bills, account information, and other financial records.

    f.  Photographs and/or video depicting possession of drugs; and

2.      Evidence of user attribution showing who used or owned **Devices A and B** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

58

Case 2:25-mj-00956-NJ    Filed 08/04/25    Page 4 of 63    Document 1

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A purple and pink iPhone (item #2) and a black<br>Samsung smartphone (item #3), currently located at<br>515 W. Moreland Blvd., Waukesha, WI 53188 | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 25-956M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A,

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b), and 846 | Distribution/possession with intent to distribute a controlled substance; use of a communication facility to facilitate the distribution/possession with intent to distribute a controlled substance; Conspiracy to distribute/possess |

The application is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Timothy Loberg, DEA Task Force Office
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 8/4/2025

*Judge's signature*

City and state: Milwaukee, Wisconsin     Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF AN**</u>
<u>**APPLICATION UNDER RULE 41 FOR A**</u>
<u>**WARRANT TO SEARCH AND SEIZE**</u>

**I.       INTRODUCTION**

I, Timothy Loberg, being dule sworn, do depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.       I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.       I am a state certified law enforcement officer employed as a Detective with the Waukesha County Sheriff's Department and have been so employed for the past 14 years. I am currently assigned to the Waukesha County Drug Task Force. I am also a federally deputized Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA). As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

3.       In connection with my official DEA duties, I investigate criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 924(c), 1956 and 1957; and Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution,

transportation, storage and importation of controlled substances. I have participated in the execution of multiple federal search warrants.

4. I have received training in the area of controlled substances investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of state and federal controlled substances laws. I have participated or assisted in numerous federal and state search warrants for narcotic related offenses that have resulted in the seizure of United States currency, vehicles, real estate, and jewelry from individuals involved in narcotics trafficking.

5. I have authored and/or aided in investigations that have led to the issuance of numerous search warrants involving violations of both state and federal narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

6. Through training, experience, and discussions with other experienced agents:

   a. I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

   b. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, methamphetamine, ecstasy, cocaine, and crack cocaine. I am familiar

2

with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

c. I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

d. I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

e. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

f. I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

g. I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, and receipts relating to the purchase of financial instruments, and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

3

h. I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i. I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing, and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses or other locations over which they maintain dominion and control;

j. I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals

4

such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

l. I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization;

m. I know drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their drugs. These traffickers usually maintain these photographs in their possession; and

n. I know a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

o. Additionally, I know that most telephone calls made by the informant are under the direction and control of case agents are recorded. Further, I know that a controlled buy can also be defined as a law enforcement operation where, under law enforcement direction, an informant utilizes the United States Postal Service (USPS), UPS, or FedEx as a means to deliver the desired quantities of controlled substances to an individual.

5

7. In addition, during the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

8. Pursuant to my official duties, I am submitting this affidavit in support of an application for a criminal complaint and arrest warrants, for violations of federal law, including violations of Title 21, United States Code, Sections 841(a)(1), and 846, Distribution of, and Possession with Intent to Distribute, Controlled Substances; Attempt and Conspiracy to commit violations of Controlled Substances Offenses, including to Distribute and Possess with Intent to Distribute Controlled Substances; and, Title 18, United States Code, Section 2.

9. I am personally involved in the investigation of the offenses discussed in this affidavit and I am familiar with all aspects of this investigation. The statements contained in this affidavit are based on my knowledge and, in part, information provided by other law enforcement officers (LEOs) including: (a) my personal knowledge and observations derived from participation in this investigation; (b) review of oral and written reports that I have received directly or indirectly from other LEOs about this and other drug-trafficking investigations; (c) discussions I personally had concerning this investigation with other experienced drug-trafficking investigators; (d) physical surveillance by the DEA and local law enforcement agencies, the results of which have been reported to me directly or indirectly; (e) public records; (f) review of telephone toll records, pen register and trap and trace information, and telephone subscriber information; (g) information provided by confidential sources working for the DEA, DCI, and the Waukesha County Drug Task

6

Force; (h) consensually-recorded phone calls between confidential sources; (i) controlled purchases of methamphetamine and cocaine; (j) review of driver's license and automobile registration records; (k) records obtained from law enforcement databases; (l) my training and experience as a DEA TFO; (m) the training and experience of other LEOs involved in this investigation; (n) and United States Postal service records.

10. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

11. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations set forth above, occurred.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

12. The property to be searched is described as follows:

    a. A Purple and Pink iPhone smartphone, (item #2), hereinafter "**Device A;**"

    b. A Black Samsung smartphone, (item #3), hereinafter **"Device B;"**

13. **Devices A, and B**, collectively the "Devices," are currently located at 515 W. Moreland Blvd., Waukesha, Wisconsin 53188.

7

14.     The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

15.     The following sub-sections set forth various types of information obtained during this investigation regarding the locations and persons described above. Such information includes but is not limited to the following: (1) information obtained from confidential sources; (2) electronic surveillance; (3) recorded conversations; and (4) physical surveillance.

## II.     PROBABLE CAUSE

### A.     Background and Summary of Investigation

4.     In February 2023, members of the Drug Enforcement Administration (DEA) and the United States Postal Inspection Service (USPIS) initiated an investigation into individuals distributing large quantities of cocaine and methamphetamine throughout Milwaukee, Wisconsin, and elsewhere. Law enforcement authorities identified the individual spearheading the DTO in Mesa, Arizona, as Alexander M. DAY (DAY) (a/k/a "Alex"). Upon further investigation, authorities learned that, beginning in at least January of 2018, DAY shipped bulk quantities of cocaine and methamphetamine pills (referred to by DTO members as "Adderall" pills) to the Eastern District of Wisconsin and elsewhere.

5.     DAY obtained multiple kilograms of cocaine from Roberto HERNANDEZ and Darrius WOLFE in the Brownsville, Texas area, some of which were sent to the Eastern District of Wisconsin, where DAY DTO distributed them. DAY, along with a partner, Miles T. ARNOLD (ARNOLD), packaged and sent cocaine through the United States Postal Service to numerous addresses in the greater Milwaukee, Wisconsin, area that are associated with the DTO. This has been confirmed by the seizure and search of postal packages, which contained cocaine.

8

6.      DAY DTO members collected the packages that were sent to various DTO addresses in the Milwaukee area. Thereafter DTO members prepared the cocaine and methamphetamine pills for distribution. Members of the DTO, including confide, distributed the cocaine and methamphetamine pills to mid-level distributors of the DTO in the greater Milwaukee, Wisconsin area. These mid-level distributors subsequently distributed the cocaine and methamphetamine pills to numerous customers in the greater Milwaukee, Wisconsin, area.

7.      The investigation revealed that the DAY DTO has sent at least 75 packages, believed to contain cocaine and/or methamphetamine, which have been delivered by the United States Postal Service, to numerous different addresses in the Eastern District of Wisconsin.

8.      Based upon their training, experience, and familiarity with the investigation, case agents believe that the DAY DTO has distributed in excess of five kilograms of cocaine, a Schedule II controlled substance, and in excess of 500 grams of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance.

9.      While the investigation to date has revealed that DAY primarily used his cellular telephone, (602) 920-1062, to conduct DTO business, case agents also believe DAY, and other DTO members also communicated with some DTO members through third-party phone applications, including Signal and WhatsApp which feature end-to-end encryption and are currently unable to be intercepted by law enforcement authorities. Moreover, the audio features of these applications allow the user of the application to place voice calls in addition to other features of the application such as texting and/or messaging capabilities.

10.     The investigation further revealed that ARNOLD primarily used his cell phone, (734) 678-2382, to conduct drug related business in furtherance of the DTO.

9

### B.     Confidential Source One (CS-1)[1]

23.     On February 16, 2023, the Waukesha County Drug Task Force was contacted by the United States Postal Inspection Service (USPIS) requesting assistance. Postal Inspectors advised case agents that the Inspectors had been tracking three parcels from Arizona all mailed on February 15, 2023, that were sent to the Eastern District of Wisconsin. One parcel bore a handwritten label addressed from "Marissa Willson 8637 E Keim Dr Scottsdale, AZ 85032." The handwritten label was addressed, in part, to "1719 Redtail Dr Hartford WI 53027." The postage paid was $28.75.

24.     The other two packages were of a similar size and weight, bearing handwritten labels sent from "Marissa Willson 8637 E Keim Dr Scottsdale, AZ 85032," and addressed to "John F N28W26587 Miami Dr Pewaukee, WI 53072." Inspectors seized and maintained custody of the parcels, and on February 16, 2023, a USPIS postal inspector received warrants from the Honorable William E. Duffin, United States Magistrate Judge for the Eastern District of Wisconsin, to open the three seized parcels.

25.     On February 16, 2023, Inspectors opened the three suspect parcels and identified the contents of the two parcels addressed to N28W26587 Miami Dr., Pewaukee, Wisconsin 53072 as clear vacuum sealed bags containing orange elliptical/oval pills imprinted with "b 974" on one side and "30" on the opposite side. Investigators subjected a sample of these pills to a TruNarc

---

[1] Beginning in February of 2023, a confidential source (CS-1) made statements against CS-1's penal interest. CS-1 is cooperating in exchange for consideration on a pending federal narcotics case. Thus far, the information provided by CS-1 has been corroborated by information known to case agents gathered during the course of this investigation. According to law enforcement databases, CS-1 has no prior criminal convictions. Within the context of the information detailed and relied upon for purposes of this affidavit, law enforcement believes CS-1 is credible and CS-1's information reliable.

10

Handheld Narcotics-1 Analyzer to field test the pills, and the test result was positive for the presence of methamphetamine.

26. Inspectors then weighed the pills while still contained within their clear vacuum sealed bags. The weighed bags were 194 gross grams and 234 gross grams, respectively, totaling 428 gross grams for the parcels addressed to N28W26587 Miami Dr., Pewaukee, Wisconsin 53072.

27. Inspectors then examined the parcel addressed to 1719 Redtail Dr., Hartford Wisconsin 53027. Inspectors performed similar investigative steps as outlined above for the parcels addressed to N28W26587 Miami Dr., Pewaukee, Wisconsin 53072. Thereafter, Inspectors determined that the parcel contained 35 pills, which, according to investigators from the Washington County Sheriff's Department, tested positive for methamphetamine.

28. Inspectors, working in conjunction with case agents, prepared to make controlled deliveries of the three parcels to the intended recipient addresses of N28W26587 Miami Dr., Pewaukee, Wisconsin 53072, as well as 1719 Redtail Dr., Hartford, Wisconsin 53027.

26. On February 17, 2023, investigators executed an anticipatory search warrant at N28W26587 Miami Dr., Pewaukee, Wisconsin. This search warrant was authorized by Waukesha County Circuit Court Judge Paul Bugenhagen.

27. The search resulted in the seizure of numerous items of drug paraphernalia, pills which have not yet been identified to date, approximately 38.9 grams of cocaine, approximately 19 grams of methamphetamine, approximately 54.6 grams of methylenedioxymethamphetamine, and approximately 34 grams of THC/THC gummies.

28. Additionally, on February 17, 2023, CS-1 was arrested in Pewaukee, Wisconsin. Upon arrest, CS-1 provided information regarding Alex DAY.

11

29.     During CS-1's Mirandized interview on February 17, 2023, case agents presented CS-1 with photographs of the pills that were contained within the parcels. In response, CS-1 identified these pills as Adderall. Case agents asked CS-1 if he/she recognized either the sender's name or address on the parcels that were delivered to N28W26587 Miami Dr., Pewaukee, Wisconsin during the controlled delivery to which CS-1 stated that he/she did not. CS-1 confirmed that the listed parcels recipient address, N28W26587 Miami Dr., Pewaukee, Wisconsin 53072, is his/her address; however, CS-1 did not know the listed intended recipient on the parcels, "John F." When case agents asked CS-1 whom he/she knows from Scottsdale, Arizona, or the Scottsdale area, CS-1 stated, "Alex DAY."

30.     CS-1 stated that DAY previously resided in Milwaukee, Wisconsin until approximately nine years ago when DAY moved to Arizona. CS-1 further stated that DAY owned a detailing company in Arizona, which CS-1 believed to be named "Detail Boys." CS-1 indicated that he/she and DAY communicated mainly through text messaging, and CS-1 and DAY frequently discussed drug transactions in these messages. CS-1 stated that DAY was able to obtain for CS-1 "whatever" CS-1 wanted and was able to supply significant quantities of those controlled substances to CS-1.

31.     Regarding the two parcels delivered during the controlled delivery that day, CS-1 stated that DAY contacted CS-1 a few days prior asking if CS-1 would be willing to receive parcels at his/her residence. CS-1 agreed to accept the parcels for DAY. CS-1 stated that one of the parcels was designated for CS-1 and the other parcel was for someone else, but at DAY's request CS-1 had agreed to accept both parcels at CS-1's residence. CS-1 stated that sometimes DAY, himself, would come to CS-1's residence in person to retrieve parcels after they have been delivered; other times DAY would send different people to CS-1's residence to retrieve the parcels. CS-1 stated

12

that while he/she knew that the parcels were coming to his/her residence and that both of the parcels contained drugs, CS-1 did not know the exact quantity or weight of drugs contained in the parcels. CS-1 stated that DAY had not instructed CS-1 regarding the other parcel, and that DAY would often give CS-1 instructions at a later time. CS-1 stated that the parcels CS-1 received from DAY usually contained cocaine and/or pills, and that CS-1 had last received a parcel from DAY approximately four weeks prior to the interview.

32. Case agents conducted numerous proffered interviews of CS-1 beginning around March of 2023 and continuing through August of 2023. CS-1 stated that CS-1's source of supply for various drugs, including cocaine and "Adderall pills" (CS-1 did not realize that the pills actually consisted of methamphetamine), was Alex DAY, who resides somewhere near the area of Scottsdale, Arizona. CS-1 has communicated with DAY through two phone numbers, which were identified as a "regular phone number" (602) 920-1062, and an additional "burner phone number" (602) 918-0627. CS-1 stated that CS-1 and DAY primarily communicated on (602) 920-1062. Case agents have since learned that the "burner phone number," (602) 918-0627, is inactive.

33. CS-1 stated that CS-1 began obtaining controlled substances from DAY approximately five years ago. CS-1 obtained cocaine, "Adderall pills" and Oxycodone pills from DAY.

34. CS-1 stated that prior to loaning DAY $15,000, discussed below, CS-1 believed that DAY was sourced with cocaine from an unknown local supplier in Arizona. After the loan, DAY began traveling to Brownsville, Texas to obtain kilogram quantities of cocaine from a new source of supply. CS-1 did not know from whom DAY obtained the kilograms of cocaine but knew that DAY would travel from Arizona to Texas every two to three months in order to obtain

13

kilograms of cocaine. DAY then utilized the United States Postal Service to mail the kilograms to various locations, including but not limited to CS-1's residence in Wisconsin.

35.     CS-1 stated that in addition to communicating with DAY on his "regular phone," CS-1 also communicated with DAY through the Signal telephone application, an end-to-end encryption application. CS-1 further stated that the telephone number associated with DAY's Signal telephone application is also (602) 920-1062, DAY's main number. CS-1 also related that the communication between CS-1 and DAY was not strictly limited to this number, and that CS-1 and DAY also communicate using various social media platforms.

36.     CS-1 stated that DAY has shipped CS-1 cocaine and "Adderall pills," methylenedioxymethamphetamine (commonly known as "ecstasy"), and Oxycodone to CS-1 to be distributed in the Milwaukee, Wisconsin area. After obtaining the various controlled substances from DAY, CS-1 distributed the substances received from DAY to various known customers in the Milwaukee, Wisconsin area.

37.     Additionally, CS-1 stated that DAY travels to California, where DAY meets with an unknown source of supply for "hundreds" of THC vape cartridges, which are then traded in Brownsville, Texas for cocaine. CS-1 stated that DAY related partial information about DAY's activities in Brownsville, Texas to CS-1. CS-1 neither knows DAY's source of supply nor any other identifying information for the source. CS-1 believes, based on communications with DAY, that the Texas source of supply is connected to a cartel. DAY told CS-1 that DAY pays between $22,000 to $24,000 per kilogram to the Brownsville, Texas source of supply. CS-1 further stated that DAY was shipping controlled substances, including but not limited to kilograms of cocaine, to unknown individuals in Michigan and Minnesota. CS-1 stated that DAY has been involved in large-scale controlled substance distribution for "years."

14

### C.    Alexander M. DAY

38.    As discussed herein, Alexander M. DAY (a/k/a "Alex"), a white male born June 17, 1988, is a cocaine and methamphetamine trafficker who obtained these substances for further distribution to mid-level drug traffickers. During the course of this investigation, case agents determined that DAY used several cellular telephones, including (602) 920-1062 and (602) 918-0627, and also utilizes the Signal telephone application which is accessed through (602) 920-1062.

### i.    USPS Identified Suspicious Packages Associated with DAY

39.    Case agents reviewed reports related to an investigation conducted in 2022 by the United States Postal Inspection Service in conjunction with the North Central High Intensity Drug Trafficking Area (HIDTA) regarding DAY and Vanessa OLSON, a DTO member and DAY's girlfriend at the time. A review of these reports reflects that in early 2022, the United States Postal Inspection Service had identified suspicious parcels that were sent to 1132 N. 46th Street in the City of Milwaukee, an address associated with Adam HICKMAN. Case agents determined that 1132 N. 46th Street, Milwaukee is HICKMAN's old address and then served as HICKMAN'S Airbnb, a rental location.

40.    The reports further stated that on Wednesday, January 26, 2022, the Minneapolis, Minnesota domicile contacted Milwaukee USPS. The Minneapolis domicile notified Milwaukee USPS of an investigation related to an address in Duluth, Minnesota as well as Phoenix, Arizona. The USPS located a suspected drug parcel sent to 1132 N. 46th Street, Milwaukee, Wisconsin, with an originating address in Scottsdale, Arizona. Internal USPS database searches revealed that 1132 N. 46th St., Milwaukee, Wisconsin, had received numerous parcels sent from both Phoenix and Scottsdale, Arizona.

41.     USPS Inspectors removed the suspected parcel from the mail stream.  USPS inspectors observed that the parcel, a USPS branded Priority Mail Express envelope, weighed approximately 6.55 ounces, bearing a handwritten label. The sender's address was listed as 3234 N. Scottsdale Road, Scottsdale, Arizona 85251, and addressed to "Adam Hickman, 1132 N. 46th St. Milwaukee, WI 53208." The postage paid was $26.95. Case agents know through bank account records, public websites for Detail Boys, and the investigation to date that 3234 N. Scottsdale Road, Scottsdale, Arizona is the address for Detail Boys, a business owned by DAY.

42.     A Law Enforcement canine alerted on the parcel and USPS Inspectors obtained a federal search warrant to search the parcel. Located within the parcel were two vacuum sealed plastic bags with oval shaped, salmon-colored pills with "b974" and "30" stamped onto them. The pills had a gross weight of 118 grams. The TruNarc NarcotiCS-1 Analyzer identified the pills as methamphetamine, and the parcel was seized by USPS.

43.     On March 4, 2022, USPS identified three parcels that were mailed from two Texas addresses, one of which was intended for "Adam Hickmann" at 1132 N. 46th St., Milwaukee, Wisconsin, while two other parcels were intended for 429 W. Boden St., Milwaukee, Wisconsin. Based upon the investigation to date, USPS Inspectors removed one of the parcels from the mail stream and the post office retained the remaining two parcels.

44.     After removing the parcel from the mail stream, USPS Inspectors observed that the parcel was a white colored USPS branded Priority Mail Express box, weighing approximately 2lbs, 10 ounces or approximately 185 grams. Case agents' review of the affixed handwritten label revealed a return address of "James Holland, 14 Pointsettia Pl., Brownsville TX 78520," and a listed recipient of "Adam Hickman" at 429 W. Boden St., Milwaukee Wisconsin 53207. The paid postage was $57.70.

16

45. A law enforcement canine alerted to the parcel and Inspectors obtained a federal search warrant to open and search the parcel. Inside the parcel, USPS located a vacuum sealed plastic bag with a pressed brick of a white powdery substance, bearing a gross weight of 326 grams. The TruNarc Analyzer identified the substance as cocaine. The parcel was seized by the USPS.

46. On March 5, 2022, Adam HICKMANN was recorded on USPS CCTV at the Bayview Post Office, 1603 E. Oklahoma Ave., Milwaukee, Wisconsin, presenting his driver's license to a USPS employee who provided him with one of the three original parcels from the sending address in Texas. The third parcel was delivered to 1132 N. 46th Street, Milwaukee, Wisconsin.

47. On April 15, 2022, Hickman was recorded on USPS CCTV at the Mid- City Post Office, 3421 W. Vliet St., Milwaukee, Wisconsin, picking up a parcel that had been shipped from the Phoenix, Arizona area. USPS Inspectors stated that the parcels' characteristics matched the methamphetamine parcel previously mailed to 1132 N. 46th St., Milwaukee, Wisconsin that was sent from Scottsdale in January of 2022.

### ii. CS-1's Cellular Telephone Information Confirmed that DAY and ARNOLD Obtained Kilograms of Cocaine in Brownsville, Texas

48. Case agents reviewed, in part, the contents of CS-1's forensic cellular telephone extraction. Specifically, case agents reviewed Signal conversations between CS-1 and DAY, where DAY used the Signal phone application through (602) 920- 1062. The vast majority of the retrieved Signal communications were drug related. The conversations, in part, related to the shipping of cocaine and Adderall pills to CS-1 at various residences in the Eastern District of Wisconsin. During the conversations, DAY acknowledges utilizing the United States Postal

17

Service for years and shipping "multiple packages." CS-1 and DAY further discussed utilizing drug proceeds to re-invest into additional drug purchases and selling to additional customers.

49.     For example, on June 3, 2021, CS-1 asked DAY, "Why about the brick?" DAY then followed up with a photograph of what appears to be a large quantity of orange Adderall pills and unknown blue colored pills, along with knotted bags of a white powdery substance. Based upon my training and experience, the depicted white powdery substance is packaged in the same manner as the packaging of cocaine for resale.

50.     As another example, on June 6, 2021, DAY sent a photograph of multiple kilograms of cocaine to CS-1. Some of the kilograms were wrapped in silver duct tape and at least four kilograms are vacuum sealed in clear bags. CS-1 responded to the photo, "What the fuck!!!!" and DAY replied, "lol," and "I think we just struck golf" (which case agents believe to be a typographical error and DAY likely meant "gold" instead of golf). On June 7, 2021, CS-1 asked, "So what the scoop with everything? What's the plan?" DAY replied, "We going to Brownsville Texas to buy a brick and then shoot it out." CS-1 asked, "Who's we? You know this cat?" DAY responded, "They do good business" and "Straight Mexican." DAY continued, "And I'm gonna head out there with my Boy Miles cause he wants some as well." CS-1 asked, "Oh hell yeah! What's he taxing?" and "He prob gets it pretty cheap being close to the border and all." DAY responded, "He gonna charge 29 this first run which is 11k cheaper then what we are at right now he said he will go as low as 23 after we are consistent and do good business." CS-1 asked DAY if DAY was driving or flying and DAY replied, "Gonna just fly there and then package everything there and ship them out." CS-1 and DAY then discussed selling the kilogram of cocaine. They further agreed that if the quality of the cocaine was good then CS-1 and DAY could sell it to their customers for more money per ounce. Based upon their familiarity with the investigation, case

18

agents believe that "Miles" referenced in the above conversation is Miles ARNOLD, as discussed below.

51. CS-1 and DAY further discussed traveling to Brownsville, Texas and/or obtaining kilogram quantities of cocaine on July 20, 2021, October 5, 2021, February 1, 2022, February 22, 2022, March 29, 2022, April 18, 2022, April 26, 2022, and July 20, 2022, in addition to the dates discussed herein.

52. Further, on March 24, 2022, CS-1 asked DAY, "How much are you grabbing total?" DAY responded a couple of messages later, "Jus the half I'm bringing my boy Miles who wants to get involved in the process so I'm gonna split half of one with him. He doesn't have enough to cover another 1 with me and those guys won't break a full one." CS-1 asked, "What's the word with the chunk that got shipped back? That still there? Did you already get rid of the brick you sent back to your house last time. You sent one here, and 1 to AZ." DAY replied, "The brick is gone we aren't gonna see that product that was sent back to TX." On March 25, 2022, DAY told CS- 1, "I'll have miles send 1 yo your house and then I'll send 1 to your house and 1 to your office." Again, case agents believe that "Miles" referred to in this message chain is Miles ARNOLD.

53. Additionally, on July 9, 2022, DAY sent CS-1 a screenshot of flight information that displayed a flight from Dallas/Fort Worth International Airport to Valley International Airport located in Harlingen, Texas, which is approximately 25 miles from Brownsville, Texas. The screenshot depicts flight 3201 on SkyWest airlines (operating as American Eagle) for Monday, July 11, 2022, showing passengers as "Alexander Day" and "Miles Arnold." On July 11, 2022, CS-1 asked DAY to send out the Adderall before DAY left and DAY replied, "I can get them out, if not they'll go out tomorrow. Vanessa is still in town while I'm gone." Later in the conversation

19

CS-1 asked, "So Vanessa is sending the adds out tomorrow then?" DAY responded, "I'll have her ship yours tomorrow." CS-1 replied, "Alright cool! You shipping the girl out Wednesday then." DAY responded, "Yessir." Based upon my training, experience, and familiarity with the investigation, I know that "adds" is short for Adderall and "girl" is commonly a code word used for cocaine.

54.     On July 12, 2022, DAY sent CS-1 this message, "My boy miles will be doing the shipping he's here with me." CS-1 asked, "Is miles packaging it or are you?" DAY replied, "We both are I already packages 1 key packaging another one now."

### iii.     At the Direction of Case Agents, DAY Shipped Controlled Substances to CS-1

55.     In late March of 2023, case agents met with CS-1. Previously, CS-1 had informed case agents it was normal for CS-1 to communicate with DAY, on average, one to two times a month, to request controlled substances. Usually, these communications involved a request from CS-1 for DAY to ship CS-1 a USPS package containing a "Zip" (i.e., according to CS-1, one ounce quantity) of cocaine, and up to 100 methamphetamine pills, which CS-1 referred to as "Addys" (short for Adderall). Case agents and CS-1 agreed that in order to remain consistent with shipments of USPS parcels to CS-1 from DAY, case agents instructed CS-1 to order cocaine and Adderall pills (methamphetamine) from DAY. Further, CS-1 informed case agents that CS-1 would not have to pay for either the cocaine or methamphetamine pills because DAY owed CS-1 money, and DAY had been repaying CS-1 for the previous debt owed by DAY (i.e., the $15,000 debt referred to above) by supplying cocaine and methamphetamine pills to CS-1 at no cost.

56.     From March of 2023 through late January 2024, case agents arranged controlled shipments of cocaine and methamphetamine from DAY utilizing CS-1. For each of these controlled shipments, CS-1 contacted DAY through various platforms to arrange the transactions.

20

In turn, DAY sent the requested substances to CS-1 through the United States Postal Service to various addresses located in the Eastern District of Wisconsin that CS-1 provided to DAY. Because DAY continued to owe a drug debt to CS-1, CS-1 did not exchange any money with DAY for the controlled substances sent to CS-1 by DAY. During this time frame, DAY facilitated the purchase of approximately 139.5 gross grams of cocaine and 441.5 gross grams of methamphetamine.

57. For each of the controlled shipments, the process was constant. CS-1 requested a quantity of controlled substances from DAY, which DAY would eventually agree to send to CS-1. Once DAY shipped the controlled substances through the United States Postal Service, DAY sent CS-1 a photograph of the USPS shipping receipt that depicted the USPS tracking number. Upon CS-1 receiving the tracking information from DAY, CS-1 contacted case agents, who then contacted USPS Inspectors and notified Inspectors of the parcel's tracking number. Case agents requested that Inspectors intercept the parcel once it arrived at the Milwaukee sorting facility.

58. Upon arrival at the Milwaukee sorting facility, USPS Inspectors contacted case agents when Inspectors had intercepted the parcel. Inspectors maintained possession of the parcel shipped by DAY until case agents met with USPS Inspectors to retrieve the parcels shipped to CS-1 by DAY. Upon meeting with case agents, Inspectors turned over the parcel shipped by DAY and/or Chauncey HARVEY.

59. After obtaining the parcel from Inspectors, case agents examined it. Case agents then photographed the parcel, as well as the parcel's label. Case agents opened the USPS parcel and inspected the contents. Case agents removed the controlled substances, which were then weighed and subjected to a field test. For each of the substances obtained by CS-1 from DAY, the field test was positive for each respective substance (cocaine and/or methamphetamine).

21

**March 30, 2023, Controlled Shipping**

60.    The initial text messages sent by CS-1 to DAY were typed and sent at the direction and in the presence of case agents. CS-1 asked DAY whether DAY had any "product available," and that CS-1 would like DAY to ship "some shit out Monday if possible." DAY responded, "I got you brother" and asked if CS-1 needed "adds" (which case agents know to be short for Adderall). CS-1 responded that CS-1 needed "Adds and girl." DAY did not immediately respond.

61.    Several days later, case agents again met with CS-1 in order to further discuss the transaction with DAY. Upon meeting with case agents, CS-1 sent a text message to DAY at cellular telephone number (602) 920-1062 stating, "You check inventory? You'd be the man if I could get 2 zips and 100 adds sent out tomorrow. Peeps are bugging me." Based upon their training, experience, and familiarity with the investigation, case agents know this to be in reference to a two-ounce quantity of cocaine and 100 "Adderall" pills. This text message was followed by an additional text message CS-1 sent to DAY stating, "Think you can make that happen for me daddy?" DAY replied, "I can make that happen for you pal." During the same text message thread, CS-1 asked DAY to send the cocaine and methamphetamine pills to a specific address in Milwaukee, Wisconsin, and also requested that DAY supply CS-1 with the USPS tracking number associated with the parcel so that CS-1 could track the package.

62.    CS-1 again did not receive an immediate response from DAY, which CS-1 stated was not unusual. CS-1 had previously informed case agents that DAY was "unreliable." Text messages would often go unreturned, or DAY would not send the requested product in a timely manner despite DAY telling CS-1 to the contrary. The next day, CS-1 sent a text message to DAY stating, "Rise and shine! You going to be able to get that out today? Have some buddies leaving

22

later this week and are relying on it." CS-1 and DAY sent a few text messages back and forth throughout the day, and DAY eventually sent a text message to CS-1 stating, "I got you bro."

63. The following day, CS-1 sent another text message to DAY stating, "You sending that stuff out soon?" DAY replied, "Yessir." CS-1 and DAY exchanged several more text messages, and later in the day DAY sent CS-1 a picture of a USPS shipping receipt. A review of the USPS shipping receipt revealed that on March 29, 2023, DAY sent two "Express 1-day" packages through USPS. One package was destined for California, while the other was destined for Milwaukee, Wisconsin. The shipping cost for each package was $28.75, and the tracking number was visible on the receipt. According to the USPS receipt, the scheduled delivery date was Thursday, March 30, 2023, and the package was sent from the "Mesa Desert" USPS location at 6644 E. Broadway Road, Mesa, Arizona.

64. On May 3, 2023, case agents met with USPS Inspectors. Inspectors provided case agents with a USPS surveillance video obtained from the USPS location in Mesa, Arizona, dated March 29, 2023. Case agents reviewed this video, and observed that at approximately 2:48 p.m., DAY entered the lobby of the post office. Case agents observed DAY with two parcels and what appeared to be a cellular telephone. DAY approached the counter at approximately 2:56 p.m. and case agents observed DAY hand the parcels to the postal worker. DAY exited the post office at approximately 3:02 p.m. Case agents identified Alexander DAY through a comparison of his driver's license photographs obtained from both the Wisconsin Department of Motor Vehicles and the Arizona Department of Transportation, as well as from comparisons to DAY's publicly accessible social media accounts.

65. Based upon their training, experience and familiarity with the investigation, case agents are aware that at the time of this controlled shipping, HERNANDEZ was DAY's sole source

23

of cocaine. To this end, case agents further believe that HERNANDEZ supplied DAY with the cocaine that DAY shipped to CS- 1 on this date.

66. This package was subsequently seized by case agents as described above and contained approximately 139.5 gross grams of cocaine and 106.1 gross grams of methamphetamine.[2]

### D. Miles T. ARNOLD

67. As discussed herein, Miles T. ARNOLD (a/k/a "Miles"), a white male born August 16, 1987, is a cocaine trafficker who obtains this substance with DAY for further distribution to mid-level drug traffickers. During the course of this investigation, case agents determined that ARNOLD uses cellular telephone (734) 678-2382.

68. Since at least December of 2020, ARNOLD has been responsible for distributing large quantities of cocaine along with DAY throughout Milwaukee, Wisconsin. Based upon the investigation to date, it is also believed that DAY and ARNOLD no longer have as close a relationship as they did in the past.

69. As detailed below, case agents know that around May 2023 ARNOLD and DAY had a disagreement over money.

### i. DAY Identifies Miles ARNOLD as DAY's Drug Trafficking Partner

70. On May 24, 2023, at approximately 4:45 p.m., CS-1 called DAY using the Signal telephone application, which is utilized through DAY's cellular telephone number (602) 920-1062.

---

[2] On September 12, 2023, DAY informed CS-1 that the cocaine would not cost CS-1 "1000 per u it after we got robbed in Texas." CS-1 questioned why CS-1 would have to pay at all give the outstanding debt, and DAY informed CS-1 that "we lost our connect with that cheap pricing" which case agents believe to be in reference to the Brownsville, Texas source of supply (i.e., HERNANDEZ and WOLFE).

24

DAY did not answer this call. CS-1 then called DAY again at approximately 4:46 p.m., and CS-1 was able to record the telephone call.

71. During this call utilizing the Signal telephone application, DAY stated that he had been "running carts" (making reference to marijuana vape cartridges) with DAY's "Texas people." DAY related to CS-1 that approximately one month ago, DAY learned "Their shit got caught up in Mexico, blah, blah, blah, fucking some guys are gonna pay for this shit, dude, they fucking basically like gave carts to the wrong person, didn't get paid, so I'm like ok bro, listen." CS-1 asked DAY if DAY was receiving from or selling carts to them. DAY responded that DAY was selling carts to them, and that DAY was buying carts in "LA" and bringing the carts to "them" in Texas. DAY further stated that DAY had a "side partner" named "Miles" whom DAY thought CS-1 did not know. DAY related that "Miles" buys "His own inventory as well, and I connected him with the Mexicans and shit right, these fucking guys." CS- 1 asked if "Miles" was the guy who would sometimes travel to Texas with DAY, and DAY stated that it was, and that "Miles" was "flamboyant."

72. Based upon an examination of databases and subpoenaed records, case agents believe "Miles" to be Miles ARNOLD, W/M, DOB: XX/XX/1987. Based upon their training, experience and familiarity with the investigation, case agents further believe that during this portion of the conversation, DAY informed CS-1 that DAY sells marijuana vape cartridges obtained from Los Angeles, California to the Brownsville, Texas cocaine suppliers in exchange for discounted cocaine. Case agents further believe that Miles ARNOLD is a drug distribution partner with DAY ("DAY had a "side partner" named "Miles"). Case agents also believe that DAY introduced ARNOLD to the Mexican cocaine suppliers ("I connected him with the Mexicans and shit") and that ARNOLD had traveled to Brownsville, Texas with DAY in the past.

25

73.     CS-1 told DAY that CS-1 had never met "Miles" but had heard DAY previously talk about "Miles." DAY stated, "He's my boy bro, and fucking, like, kid's got bread. Fucking does well for himself, fucking you know, he's in the game. So anyways long story short, he started coming in with me and shit cause we were getting shit for a little bit cheaper. We were buying multiple units and shit like that you know, that's why I was getting 'em for the price I was getting 'em for, and them um, so he was actually handling some of the business for me. So, he'd go to LA, he'd pick up the LA product, he'd go to fucking Brownsville, and then we would switch off or whatever. Well, this last time, dude, I was just fucking you know, I was not doing. I didn't go to Brownsville. I had some shit to handle out of that jet deal, so I had to stay back. He went to LA, got the carts, went down to fucking Brownsville. I was still dealing with the jet deal. The whole deal was for him to sit down there and fucking camp down there, let the guys sell the fucking carts, out of the hotel basically, right? And then get them off, and then he would get the full unit, units, the two units." CS- 1 responded, "Yep."

74.     DAY continued and stated that the "dude" wanted to go to "EDC" (believed by case agents to be a music festival in Las Vegas). Because ARNOLD wanted to go to "EDC," the Texas people "Took all the product, which was like 1,000, no 1,200 carts, 500 fucking pre-rolls. He was supposed to sell them all, get all the cash, give to them, and then fucking basically have credit towards the units. He fucking gave 'em all the shit bro. These motherfuckers are now telling me that they got raided. Oh, we got raided. They call him Colorado, oh, Colorado got raided bro." Based upon their training, experience and familiarity with the investigation, case agents believe that ARNOLD and DAY became partners in the cocaine distribution business in order to obtain kilogram quantities of cocaine for less money ("he started coming in with me and shit cause we

26

were getting shit for a little bit cheaper, we were buying multiple units and shit like that you know, that's why I was getting 'em for the price I was getting 'em for").

75.     Case agents further believe that DAY traveled to Brownsville to obtain kilogram quantities of cocaine. In this regard, case agents have viewed photographs of cocaine kilograms contained in CS-1's phone extraction. Case agents are further aware from the review of the CS-1's telephone extraction that CS-1 and DAY refer to kilograms of cocaine as "units." Additionally, case agents believe that ARNOLD traveled to Brownsville, Texas at the direction of DAY to obtain one or two kilograms of cocaine ("then he would get the full unit, units, the two units"). Case agents further believe that the Texas cocaine suppliers took all of ARNOLD and DAY's marijuana vape cartridges and pre-rolled marijuana products without either paying ARNOLD or getting credit toward the kilograms of cocaine ("took all the product" and "basically have credit towards the units").

76.     CS-1 told DAY that CS-1 thought "they just jacked it," and DAY responded, "And fucking Miles is like you bitch ass, and I was like, bro, listen, you fucking left, you left fucking Texas with no money and no product motherfucker, and you thought that they were going to fucking send us money? And our inventory out, are you fucking kidding me, bro, like how the fuck, how dare you bro." DAY told CS- 1 "he's actually a smart kid" but "long story short, that happened, and just so you know when I was like I'll send you out the units and shit, no problem, dude that didn't happen because that's what happened." CS-1 told DAY that made sense to CS-1. CS- 1 further told DAY that DAY was smarter than that, and that DAY had put too much trust and DAY interrupted, stating, "I mean I only have so much fucking time on me so when I gotta partner and shit, like I'm getting better deals and shit, and he's doing some of the legwork, like it worked bro, it was working. You know it worked, and like dude if the kid, if he needed 10 grand I'd give

it to him; if I need fucking 20 grand he'd give it to me. Like it didn't matter, it's kinda like me and you, you fucking gave me 15 g's." Based upon their training, experience, and familiarity with the investigation, case agents believe that DAY was upset with ARNOLD for losing the money and not obtaining the kilograms of cocaine ("you left fucking Texas with no money and no product"). Case agents further believe that DAY explained to CS-1 why DAY had not sent CS-1 the requested quantities of cocaine recently ("just so you know when I was like I'll send you out the units and shit, no problem, dude that didn't happen because that's what happened").

77. DAY stated to CS-1 that DAY was at a "crossroad." DAY needed to figure out a way to recoup their money. DAY stated, "He's talking to me, he's talking to me right now. I'm like bro, I know you just fucking tried to jack my shit bro. Don't give me no bullshit. Like I want fucking money right now bro, like, and it's like do I go the route of being like, hey, I'm a Caucasian, like listen bro, I got my own fucking plugs; you might be cartel but I got my own plugs. Do I put it out there or do I say fuck it and chalk up the loss and say fuck it you know?" CS-1 told DAY that CS-1 didn't know the guys that DAY was dealing with, but they were probably more connected and had more pull than DAY so CS-1 told DAY not to put himself in harm's way. DAY agreed with CS-1. Based upon their training, experience, and familiarity with the investigation, case agents believe DAY informed CS-1 that DAY remained in contact with the Mexican Cartel cocaine suppliers in Texas ("he's talking to me right now, I'm like bro, I know you just fucking tried to jack my shit bro" and "you might be cartel, but I got my own plugs"). Further, case agents believe that DAY asked the supplier for DAY's money back ("like I want fucking money right now bro").

78. DAY told CS-1 that it was "a little bit of an L," but DAY continues to make money on "the girl." CS-1 told DAY that if those guys wanted to keep doing business with DAY that they

28

would "come straight." DAY agreed and said that was what DAY thought the last time and "why would I bring any of our business down to them, you know?" DAY continued, "But the thing is I just wanna be like, bro, that's fine, like you know shit happened but like then figure out a way to like credit me for the next units you know? I wanna wait for the next units that's it." CS-1 told DAY that was a conversation that DAY would have to have with them. CS-1 again told DAY to be careful and not to do anything that would "get yourself killed." DAY stated, "I'm not trying to do that shit either, bro." DAY indicated that DAY was going to try and work out the problem.

79.    Based upon their training, experience and familiarity with the investigation, case agents believe that DAY told CS-1 that DAY lost money ("a little bit of an L") but was still making money selling cocaine ("the girl"). Case agents further believe that DAY would like to continue to conduct cocaine transactions with the Mexican suppliers in Texas if the suppliers agreed to credit DAY's money towards the purchase of the next kilogram(s) ("shit happened but like then figure out a way to like credit me for the next units you know? I wanna wait for the next units that's it").

80.    CS-1 told DAY "the ads is good" and that CS-1 had been busy. CS-1 and DAY then engaged in general conversation after which time CS-1 asked DAY, "So you didn't send the Ads out yet?" DAY replied, "I'm going to send them out today. They'll be there tomorrow, and I'll be working on the other part of the order." CS-1 told DAY to send the tracking information and CS-1 would be "good to go." Case agents are aware that at their direction, CS-1 had attempted to order "Adderall" pills and one to two ounces of cocaine from DAY. Case agents believe DAY informed CS-1 that DAY would be sending the Adderall pills to CS-1, but that DAY was still trying to obtain the cocaine requested by CS-1. ("I'm going to send them out today. They'll be there tomorrow, and I'll be working on the other part of the order").

29

81.     On June 26 and 27, 2023, CS-1 forwarded case agents text messages that were sent between CS-1 and DAY. DAY previously told CS-1 that DAY experienced issues with DAY's source of supply in (or near) the area of Brownsville, Texas. During the conversation CS-1 asked DAY, "You ever straighten up everything with your guy in TX?" After general conversation DAY responded, "And nah we got took bro I loss 44k in total. Shit sucks. I got another connect though." These conversations occurred at the direction of case agents as case agents directed CS-1 to ask DAY whether DAY could send CS-1 additional cocaine and Adderall pills. Case agents believe that DAY lost $44,000 in drugs and/or drug proceeds to the Texas supplier, but that DAY had an alternate source of supply for DAY's cocaine ("I loss 44k in total. Shit sucks. I got another connect though").

### ii.   Corroborating Financial and Airline Records

82.     Case agents subpoenaed US Bank records pursuant to this investigation. In part, case agents observed that US Bank business triple cash rewards card ending in X4432, is affiliated with Detail Boys, LLC, a business known through this investigation to be owned and operated by Alex DAY. Based upon the investigation to date, and information obtained from CS-1, case agents know that DAY owns and operates a business called Detail Boys.  Additionally, on multiple occasions CS-1 and DAY have discussed DAY's detailing business. DAY frequently posts on various social media platforms about Detail Boys business. Further, case agents have examined numerous bank records, and those records reflect that DAY lists himself as the owner of Detail Boys. DAY is also listed as the sole owner of the bank accounts bearing the name of Detail Boys. A review by case agents of Alex DAY's Facebook page revealed that DAY states that he is the "Owner and Founder of Detail Boys LLC."

30

83. Case agents noted that on December 4, 2022, DAY's bank account posted a transaction from "American," believed to be American Airlines. A review of the transaction revealed a debit to the account in the amount of $170.60 for Alexander DAY, and the same amount for Miles ARNOLD. Case agents believe this transaction reflects the purchase of airline tickets from Phoenix, Arizona to Los Angeles, California. On December 6, 2022, case agents' review of a separate transaction revealed a debit in the amount of $170.60 for Alexander DAY. Case agents believe that this purchase corresponded to the purchase of an airline ticket from Los Angeles, California to Phoenix, Arizona. On December 9, 2023, in a separate transaction, a review of this account by case agents revealed a debit in the amount of $278.60 for Alexander DAY corresponding to the purchase of an airline ticket from McAllen, Texas to Dallas, Texas; then from Dallas, Texas to Phoenix, Arizona.

84. Case agents have reviewed flight records from United Airlines regarding Alexander DAY, Vanessa OLSON, and Miles ARNOLD. Among other flights, the records indicated that on April 27, 2022, Alexander DAY and Miles ARNOLD departed Phoenix International Airport on a flight destined for Valley International Airport with a connecting flight through Houston, Texas. Case agents know that Valley International Airport is approximately 30 miles from Brownsville, Texas.

85. A further review of United Airlines records revealed that on January 25, 2023, Alexander DAY departed Brownsville/South Padre Island International Airport destined for Phoenix International Airport with a connecting flight through Houston, Texas.

86. United Airlines records further reflect that on May 17, 2023, Miles ARNOLD departed Brownsville/South Padre Island International Airport destined for Phoenix International Airport with a connecting flight through Houston, Texas.

31

87. Case agents also received flight records from American Airlines regarding Alexander DAY, Vanessa OLSON, and Miles ARNOLD. Among other flights, a review of the records revealed that on March 24, 2022, Miles ARNOLD and Alexander DAY departed Phoenix International Airport destined for Brownsville/South Padre Island International Airport with a connecting flight through Dallas/Fort Worth International Airport. Case agents' review of the flight records revealed that DAY booked the flight with American Airlines, listing ARNOLD as a passenger on this reservation.

88. Case agents' further review of American Airlines records revealed that on March 26, 2022, ARNOLD and DAY departed Valley International Airport destined for Phoenix International Airport with a connecting flight through Dallas/Fort Worth International Airport. The flight records indicate that DAY booked the flight, with ARNOLD listed as a passenger on this reservation.

89. Additionally, case agents learned from American Airlines records that on July 11, 2022, ARNOLD and DAY departed Phoenix International Airport destined for Valley International Airport with a connecting flight through Dallas/Fort Worth International Airport. A review of the flight records revealed that DAY booked the flight, with ARNOLD listed as a passenger on this reservation.

90. American Airlines records further revealed that on July 13, 2022, Miles ARNOLD departed Valley International Airport destined for Phoenix International Airport with a connecting flight through Dallas/Fort Worth International Airport.

91. American Airlines records also indicated that on December 8, 2022, Miles ARNOLD departed Phoenix International Airport destined for Brownsville/South Padre Island International Airport with a connecting flight through Dallas/Fort Worth International Airport.

32

92. American Airlines records further showed that on December 9, 2022, Miles ARNOLD departed Valley International Airport destined for Phoenix International Airport with a connecting flight through Dallas/Fort Worth International Airport.

93. Additionally, American Airlines indicated that on January 22, 2023, DAY and OLSON departed Phoenix International Airport destined for Valley International Airport with a connecting flight through Dallas/Fort Worth International Airport. The flight records indicate that DAY booked the flight, with OLSON listed as a passenger on this reservation.

94. Finally, American Airlines records further revealed that on May 15, 2023, Miles ARNOLD departed Phoenix International Airport destined for McAllen- Miller International Airport with a connecting flight through Dallas/Fort Worth International Airport. Case agents know that McAllen-Miller International Airport is approximately 60 miles from Brownsville, Texas.

### E. DAY DTO Members Indicted in the Eastern District of Wisconsin

95. On March 19, 2024, a grand jury sitting in the Eastern District of Wisconsin returned a two-count indictment, charging Alexander DAY and Miles ARNOLD with conspiracy to possess with intent to distribute and distribution of five kilograms or more of cocaine, a Schedule II controlled substance. Other individuals were also charged in this indictment, but those specifics are not detailed in this affidavit. See United States v. Harvey et al., Case No. 24-CR-60.

### i. Cooperating Source Four (CS-4)

96. At various times during the spring and fall of 2024, case agents conducted proffered interviews of CS-4. [3]

---

[3] Beginning in approximately March 2024, a confidential source (CS-4) made statements against CS-4's penal interest. CS-4 is cooperating in exchange for consideration on a pending federal narcotics case. Thus far, the information provided by CS-4 has been corroborated by information

97. CS-4 stated that sometime around 2018, CS-4 was introduced to a subject only known to CS-4 as "Darrius." CS-4 subsequently identified a photograph of Darrius A. WOLFE as "Darrius," who utilized telephone number 956-443-9257.

98. CS-4 related that initially, WOLFE purchased 250-500 marijuana cartridges once every 6-8 weeks from CS-4. CS-4 shipped the cartridges from Los Angeles to Brownsville, Texas, then traveled to Brownsville to meet with WOLFE, who paid CS-4 in cash for the marijuana cartridges. Once CS-4 was paid by WOLFE, CS-4 flew back to CS-4's state of residence. At the time, CS-4 recalled charging WOLFE $20 to $25 per cartridge. Based upon conversations with WOLFE, CS-4 knew that WOLFE would later sell the marijuana cartridges in Brownsville, Texas and in Mexico. This continued through 2019 and into the spring or summer of 2020. CS-4 recalled six or seven separate transactions similar to the above description. CS-4 had visited WOLF's residence and described the residence as a "normal Brownsville house." After these transactions, CS-4 did not conduct any drug transactions with WOLFE for a period of approximately one year.

99. CS-4 stated that at the beginning of the COVID 19 pandemic, in the spring of 2020, cocaine prices dramatically increased in the state where CS-4 resided. CS-4 contacted WOLFE and asked if WOLFE had any connections to obtain kilogram quantities of cocaine for a cheaper price. WOLFE agreed, and told CS-4 that WOLFE could introduce CS-4 to someone. WOLFE eventually introduced CS-4 to WOLFE's "cousin," only known to CS-4 as "Berto" or "Roberto," who, at the time, was using phone number 956-551-9217. Case agents showed CS-4 a Texas Driver's license photograph of Roberto HERNANDEZ JR, DOB: 11/11/1997, whom CS-4

known to case agents gathered during the course of this investigation. Within the context of the information detailed and relied upon for purposes of this affidavit, law enforcement believes CS-4 is credible and CS-4's information is reliable.

34

identified as the individual CS-4 knew as "Roberto." CS-4 believed that this introduction occurred around late 2020 to early 2021 but stated that he/she could be off on the timeframe.

100. CS-4 (and eventually CS-5) flew to Brownsville, Texas at least eight separate times and obtained kilogram quantities of cocaine from HERNANDEZ. Before, during, and after these transactions, HERNANDEZ was frequently accompanied by other unknown Hispanic males. CS-4 also observed that during the cocaine transactions, many of the Hispanic males, including HERNANDEZ, were armed with guns.

101. CS-4 recalled purchasing the first kilogram of cocaine from HERNANDEZ for approximately $24,000 in cash. As CS-4 purchased additional kilograms, the price was reduced, eventually reaching a price of approximately $17,000 to $18,000 per kilogram. CS-4 stated that after purchasing the kilograms of cocaine, the cocaine was packaged and shipped via the United States Postal Service to various locations throughout the United States, including but not limited to the Eastern District of Wisconsin.

102. After conducting a few transactions with HERNANDEZ, CS-4 invited a friend (CS-5) to participate in cocaine transactions in Brownsville, Texas. CS-4 and CS-5 then began traveling to Brownsville together, with each of them financially contributing towards the purchase of kilograms of cocaine from HERNANDEZ.

103. CS-4 stated that for many of the later transactions, CS-4 and/or CS-5 would trade the marijuana cartridges with HERNANDEZ in exchange for a discount on the price of the kilograms. Eventually, CS-5 traveled to meet with HERNANDEZ alone, although CS-4 was still involved in the communications with CS-5 and HERNANDEZ regarding the cocaine transactions.

104. CS-4 stated that around spring or early summer of 2023, CS-5 traveled to meet with HERNANDEZ alone, intending to purchase two kilograms of cocaine. CS-4 and CS-5 anticipated

35

trading marijuana cartridges in exchange for a discounted price of the kilograms. CS-5 provided the marijuana cartridges to HERNANDEZ and HERNANDEZ was to bring CS-5 the kilograms shortly thereafter. However, HERNANDEZ never brought the kilograms to CS-5. As a result, CS-4 lost his financial investment in the marijuana cartridge transaction as well as CS-4's portion of cocaine that CS-4 expected from this transaction. CS-4, CS-5, and HERNANDEZ all communicated regarding the failed transaction, but HERNANDEZ never provided the promised cocaine. As a result, CS-4 and CS-5 ceased obtaining cocaine from HERNANDEZ. After this failed transaction, CS-4 continued to attempt to contact HERNANDEZ, yet HERNANDEZ failed to respond to CS-4's attempted communications.

105.    CS-4 stated that CS-4 mainly communicated with HERNANDEZ via the Signal telephone application which allowed for end-to-end encryption. Additionally, CS-4 would sometimes use other telephone numbers to communicate with HERNANDEZ that HERNANDEZ supplied to CS-4.

106.    CS-4 stated that after WOLFE introduced CS-4 to HERNANDEZ, WOLFE was no longer involved in any of the drug transactions between CS-4, HERNANDEZ, and/or CS-5. CS-4 could not say if WOLFE and HERNANDEZ had a separate arrangement regarding the transactions and could only say that WOLFE was not present during the cocaine transactions and that CS-4 did not communicate with WOLFE regarding the transactions once WOLFE introduced CS-4 to HERNANDEZ.

107.    CS-4 estimated that CS-4 (and eventually CS-5) purchased between ten and eleven kilograms of cocaine from HERNANDEZ in Brownsville, Texas.

36

## ii. CS-4 Provided Screenshots of Communications with HERNANDEZ

108.    CS-4 provided case agents with screenshots of a conversation between CS-4 and telephone number (956) 338-9553 during December of 2022. During this time, CS-4 stated HERNANDEZ used this telephone number. Case agents observed that on December 9, 2022, HERNANDEZ requested an apple cash payment of $1,500, and CS-4 responded with photographs of what appeared to be marijuana. CS-4 then sent an apple cash payment of $500, and HERNANDEZ responded "Waiting for the rest" with an "ok sign" emoji. CS-4 responded, "It's coming boss." Later in the conversation CS-4 told HERNANDEZ, "Yessir, he's landing soon." Case agents believe that this is in reference to Miles ARNOLD's December 9, 2022, travels to Phoenix, Arizona from Valley International Airport.

109.    CS-4 also provided case agents with screenshots of a conversation between CS-4 and telephone number (956) 372-0718 during April and May of 2023.  CS-4 stated that during this time, this telephone number was used by HERNANDEZ. Case agents observed that between April 23, 2023, and May 19, 2023, CS-4 sent several messages to HERNANDEZ, none of which were answered. These messages included, but were not limited to: "Signal homie;" "Feeling like I got took man, no call backs, no response, nothing bro. What's going on talk to me;" "Berto, what's the update fam;" "Yo fam, this is out of pocket;" "Bertie;" "Take it you didn't change numbers;" "You only working with me;" "No one else;" "Yooooo;" and "Berto." Based upon the investigation to date, case agents believe that these text messages referred to HERNANDEZ's failure to supply the two kilograms of cocaine to CS-5, and that CS-4 had taken a financial loss on the transaction that never transpired.

110.    On May 21, 2023, HERNANDEZ, using telephone number (831) 246- 6288, sent CS-4 a message, "Your packs were being watched, place was raided no one was at the place, you

knew those packs were watched why did you not gives heads up. Ill contact you from different phone in a few days, in Mexico. The other numbers gone." CS-4 responded, "Come on bro, I didn't pick them up, I didn't send them, miles did everything all the way through so I would have not known shit why would I have eyes on me. Especially in Brownsville of all places." HERNANDEZ responded, "He even said they landed differently thrn they were shipped." CS-4 replied, "The box was slightly damaged. High key, it's ridiculous for you to blame us at all. The product was delivered. That ends our responsibility. You took my boys product without permission and without sending anything. We need our funds asap. Where is the 3500 at a minimum. This feels like you're fucking us hard and I don't appreciate it." Based upon their training, experience and familiarity with the investigation, case agents believe that HERNANDEZ thought that CS-4 and/or CS-5 were being watched by the police ("Your packs were being watched, place was raided no one was at the place, you knew those packs were watched why did you not gives heads up") and that HERNANDEZ was no longer using telephone number (956) 372-0718 ("The other numbers gone"). CS-4 denied that the police were watching CS-4 and/or CS-5 ("Come on bro, I didn't pick them up, I didn't send them, miles did everything all the way through so I would have not known shit why would I have eyes on me. Especially in Brownsville of all places."). Case agents further believe that HERNANDEZ had taken the marijuana cartridges and intentionally failed to supply the two kilograms of cocaine as promised ("The product was delivered. That ends our responsibility. You took my boys product without permission and without sending anything"), and that as a result, CS-4 had lost at least $3,500 ("Where is the 3500 at a minimum.").

38

### ii. Cooperating Source Five (CS-5)

111. In August of 2024, case agents conducted proffer interviews of CS-5.[4] CS-5 stated that around February or March of 2022, CS-4 told CS-5 that CS-4 had organized a "Big Play" which operated out of Texas. CS-4 told CS-5 that CS-4 had an opportunity to obtain kilograms of cocaine at "good prices." CS-4 asked CS-5 if CS-5 "wanted in," and CS-4 and CS-5 discussed CS-5's possible involvement in the cocaine transactions. CS-4 was aware that CS-5 had the financial means to help CS-4 fund the purchase of the cocaine. CS-5 agreed to join CS-4 in traveling to Texas to obtain cocaine.

112. In total, CS-5 recalled taking five or six trips to Brownsville, Texas with CS-4. In addition, on approximately two occasions CS-5 traveled to Brownsville, Texas without CS-4. CS-5 estimated that these trips began in approximately March of 2022 and ended in approximately May of 2023. CS-5 recalled obtaining a total of approximately nine kilograms of cocaine in Brownsville, Texas during this time.

113. CS-5 stated that for the majority of the trips, CS-4 and CS-5 split the cost of the kilograms of cocaine, which CS-5 recalled being approximately $28,000. During the first trip to Brownsville with CS-4, CS-4 was in communication with "Umberto," whom CS-4 referred to as "Berto" or "Roberto." Case agents presented CS-5 with a Texas Driver's license photograph of Roberto HERNANDEZ JR, DOB: 11/11/1997. CS-5 stated that this was the individual whom CS-5 knew as "Umberto," and whom CS-4 referred to as "Berto."

---

[4] Beginning in approximately August 2024, a confidential source (CS-5) made statements against CS-5's penal interest. CS-5 is cooperating in exchange for consideration on a pending federal narcotics case. Thus far, the information provided by CS-5 has been corroborated by information known to case agents gathered during the course of this investigation. Within the context of the information detailed and relied upon for purposes of this affidavit, law enforcement believes CS-5 is credible and CS-5's information is reliable

114.     CS-5 stated that to CS-5's knowledge, someone in South Padre Island, Texas introduced CS-4 to HERNANDEZ, and CS-4 had obtained kilograms of cocaine from HERNANDEZ prior to CS-5's involvement. CS-5 did not know the person who made the introduction.

115.     CS-5 stated that on the first trip that CS-5 made with CS-4, HERNANDEZ and another unknown Hispanic male picked up CS-4 and CS-5 from the airport and drove to a hotel. CS-4 introduced CS-5 to HERNANDEZ as CS-4's "associate and partner." CS-5 also recalled HERNANDEZ telling CS-4 and CS-5 that HERNANDEZ had arranged for a "lead car" and "tail car" escort for the vehicle they were all riding in, and that the escorting vehicles knew to intercept the police if HERNANDEZ's vehicle was going to be stopped by the police. CS-5 stated that HERNANDEZ stressed to CS-4 and CS-5 how HERNANDEZ's "crew dealt with problems" from both law enforcement and from other individuals in the area. HERNANDEZ told CS-5 that HERNANDEZ would receive at least ten kilograms of cocaine at a time from HERNANDEZ's source of supply, whom CS-5 did not know.

116.     During the first transaction that CS-5 conducted with HERNANDEZ and CS-4, HERNANDEZ and another unknown Hispanic male brought a kilogram of cocaine to the hotel where CS-4 and CS-5 were staying. CS-5 stated that the quality of the cocaine was excellent, and CS-4 provided the money for the kilogram to HERNANDEZ. CS-5 stated that during this particular transaction, CS-5 was not aware of HERNANDEZ being in possession of a firearm. However, during subsequent drug transactions with HERNANDEZ, CS-5 knew HERNANDEZ possessed a silver handgun with custom engravings, which HERNANDEZ had both on his person as well as in the glove box of any vehicle used by HERNANDEZ.

40

117. After obtaining the kilogram of cocaine, CS-4 and CS-5 packaged the cocaine for shipment. CS-5 recalled breaking the kilogram down into four separate packages which were subsequently shipped to CS-4 and CS-5's home state via the United States Postal Service.

118. CS-5 stated that on each subsequent trip, the price of the kilogram(s) purchased from HERNANDEZ would be approximately $1,000 to $2,000 less than the prior transaction. CS-5 stated that towards the end of the transactions with HERNANDEZ, the price per kilogram reached $18,000. CS-5 stated that despite other unknown Hispanic males being present for some of the transactions, HERNANDEZ was always the one who handed CS-4 and/or CS-5 the kilograms of cocaine.

119. CS-5 stated that on one of the trips, CS-4 and CS-5 were introduced to an associate of HERNANDEZ who was a semi-truck driver. This associate offered to transport kilograms of cocaine to anywhere in the United Stated via the semi-truck for an additional $6,000 to $7,000 per kilogram. HERNANDEZ and the associate indicated to CS-4 and CS-5 that HERNANDEZ and the associate would be willing to use violence, if necessary, to facilitate and/or protect the kilogram shipments. CS-4 and CS-5 never availed themselves of this offer.

120. CS-5 stated that on CS-5's last trip to meet with HERNANDEZ, CS-4 was not present. CS-5 stated that this transaction was supposed to be for two kilograms of cocaine, which was going to be paid for by CS-5. CS-5 had taken a large amount of marijuana cartridges to sell to HERNANDEZ in exchange for a discounted price on the cocaine. CS-5 was communicating with HERNANDEZ during this transaction, and HERNANDEZ told CS-5 that HERNANDEZ had paid $150,000 for ten kilograms of cocaine; however, the kilograms had not yet been delivered. Nevertheless, CS-5 provided the marijuana cartridges to HERNANDEZ, and HERNANDEZ told CS-5 that HERNANDEZ would provide the kilograms to CS-5 as soon as they arrived. CS-5 had

41

to leave Texas for a prior commitment before receiving the cocaine, and HERNANDEZ told CS-5 that HERNANDEZ would ship the cocaine to CS-5. CS-5 communicated this situation to CS-4 and CS-4 attempted to reach a resolution with HERNANDEZ prior to CS-5's departure. Neither CS-4 nor CS-5 were able to obtain the kilograms of cocaine from HERNANDEZ, and eventually CS-4 and CS-5 "wrote the deal off as a loss." CS-5 stated that after this happened, CS-5 did not travel to Brownsville again, and had no further dealings with HERNANDEZ.

121. CS-5 normally communicated with HERNANDEZ on the Signal telephone application, but also occasionally on Snapchat. CS-5 could neither recall the telephone number associated with the Signal application, nor could CS-5 remember HERNANDEZ's Snapchat username. CS-5 recalled having a regular telephone number for HERNANDEZ at one point, but CS-5 could not recall that number or how frequently CS-5 communicated with HERNANDEZ on that telephone number.

122. CS-4 provided case agents with screenshots of a conversation between CS-4 and telephone number (956) 338-9553 during December of 2022. During this time, CS-4 stated that this telephone number was used by HERNANDEZ. Case agents observed that on December 9, 2022, HERNANDEZ requested an apple cash payment of $1,500, and CS-4 responded with photographs of what appeared to be marijuana. CS-4 then sent an apple cash payment of $500, and HERNANDEZ responded "Waiting for the rest" with an "ok sign" emoji. CS-4 responded, "It's coming boss." Later in the conversation CS-4 told HERNANDEZ, "Yessir, he's landing soon." Case agents believe that this is in reference to on December 9, 2022, Miles ARNOLD traveling to Phoenix, Arizona from Valley International Airport.

42

### iii. CS-4 Contacted Wolfe Under Case Agents' Direction

123. In late August of 2024, CS-4, at the direction of case agents, communicated with WOLFE at phone number (956) 243-0708 via the Signal telephone application connected to that telephone number. During these conversations, CS-4 arranged to meet WOLFE in Brownsville, Texas to discuss a potential meeting with HERNANDEZ.

124. For instance, on September 9, 2024, under the direction and control of case agents, CS-4 contacted WOLFE via the Signal telephone application and arranged to meet WOLFE for dinner at a restaurant in Brownsville, Texas. This meeting was recorded by case agents and the following paragraphs summarize the conversation between CS-4 and WOLFE that occurred on September 9, 2024, in Brownsville, Texas.

125. During this meeting, WOLFE was positively identified by surveillance agents when he arrived at the restaurant with an unknown female. WOLFE, the unknown female, and CS-4 then ate dinner, and engaged in a conversation that was recorded. Due to technical difficulties, the audio of the recorded meeting was difficult to decipher. WOLFE told CS-4 that WOLFE was connected to an additional source of supply named "Q" that WOLFE knew. WOLFE indicated that he could connect CS- 4 with "Q" to obtain large quantities of cocaine. CS-4 then asked WOLFE, "What's new with Berto;" however, the response from WOLFE was unintelligible. Case agents believe that this was in reference to HERNANDEZ.

126. CS-4 then stated "Listen man.Imma keep it hunded. I got no bad blood for him (HERNANDEZ). I mean...what happened was I brought somebody into my lifestyle and my business too." CS-4 stated, "It was a bad situation" and continued to talk about the circumstance in 2023 when CS-5 travelled to Brownsville, Texas at the direction of CS-4 to purchase two kilograms of cocaine from HERNANDEZ that HERNANDEZ never provided. WOLFE

43

responded, "I wasn't even in the loop on that." CS-4 told WOLFE that CS-4 was not upset about the "rip" that occurred with CS-5, and that CS-4 wanted to contact HERNANDEZ to discuss the debt and a possible future transaction with HERNANDEZ. CS-4 further informed WOLFE, "I'll run it all off you bro." Based upon their training, experience and familiarity with the investigation, case agents believe that by this statement, CS-4 informed WOLFE that CS-4 would not cut WOLFE out of future transactions. Due to the quality of the recording, case agents were unable to hear WOLFE's response. Case agents believe that CS-4 told WOLFE that CS-4 was not upset and wanted to reconnect with HERNANDEZ to settle the dispute, as well as to apologize for bringing CS-5 into the cocaine transactions ("I got no bad blood for him [HERNANDEZ]. I mean. What happened was I brought somebody into my lifestyle and my business too."). Case agents further believe that WOLFE informed CS-4 that WOLFE was not part of the failed transaction between CS-5 and HERNANDEZ ("I wasn't even in the loop on that").

127. After leaving the restaurant, case agents met with CS-4 who stated that WOLFE told CS-4 that WOLFE was going to a movie with his girlfriend and would contact CS-4 after the movie.

128. Later that evening, CS-4 received a message from WOLFE via the Signal telephone application. WOLFE stated, "Got Q here at the theatre coolin w me. I know he won't cut me out, I think if you want to fix shit with bert that's on yalls terms. If I would have been in the mix from the get go we'd all be Gucci n not in the situation…I can get you in with Q. Lemme know." Based upon their training, experience and familiarity with the investigation, case agents believe that WOLFE attempted to direct CS-4 away from HERNANDEZ ("I think if you want to fix shit with bert that's on yalls terms") and to conduct transactions with "Q" instead so that WOLFE would be

44

able to obtain a financial benefit from the transaction ("If I would have been in the mix from the get go we'd all be Gucci n not in the situation…I can get you in with Q. Lemme know.").

129. Case agents instructed CS-4 to attempt to have WOLFE connect CS-4 with HERNANDEZ. The next morning, CS-4 sent a message via the Signal telephone application to WOLFE that stated, "Yo, 2 things I'm down to link with you on Q. Doesn't hurt to make the intro. I'm hoping you can at least connect Me with Robert and I can see what's what. Like you said we got some skin in the game so would like to amend shit and move forward especially if he willing to work something out with me and I understand your position on this I do." Followed by another message that stated, "You able to connect me to Robert first." Based upon their training, experience, and familiarity with the investigation, case agents believe that CS-4 indicated that CS-4 was willing to meet with "Q" but wanted WOLFE to connect CS- 4 and HERNANDEZ to settle the dispute ("Yo, 2 things I'm down to link with you on Q") and ("I'm hoping you can at least connect be with Robert and I can see what's what. Like you said we got some skin in the game so would like to amend shit and move forward especially if he willing to work something out with me.").

130. WOLFE replied, "Robert drove to corpus last night…" CS-4 asked, "What does that mean?" WOLFE replied, "He's not in town man." Case agents believe that WOLFE informed CS-4 that HERNANDEZ went to Corpus Christi, Texas the prior evening, and was no longer in Brownsville, Texas. Therefore, HERNANDEZ could not meet with CS-4 ("Robert drove to corpus last night…") and ("He's not in town man."). CS-4 responded, "Well we tried, anyway you can connect us one time. No need to meet in person I guess. Let's talk to que today than."

131. Later the same day, CS-4 sent WOLFE a text asking, "Did Robert just say he don't want to talk to me, I know you got cut out so you had no control on what happened. Just had skin

45

in the game with him bro that why I was hoping to make something work out of it. Fake carts or not he made money on it. I'll hit you in an hour about lining." WOLFE responded, "Doesn't look like he had interest in reconnecting." CS-4 replied, "I figured, it's all love. Let's talk business then." Based upon their training, experience, and familiarity with the investigation, case agents believe that CS-4 attempted to have WOLFE contact HERNANDEZ. Yet HERNANDEZ declined to meet with CS-4 ("Doesn't look like he had interest in reconnecting."). Case agents further believe that CS-4 understood and would further discuss with WOLFE a possible cocaine transaction ("I figured, it's all love. Let's talk business then."). At the time, case agents directed CS-4 to keep WOLFE and "Q" in abeyance.

132. Due to the poor quality of the September 9, 2024, recording in Brownsville, Texas, case agents later instructed CS-4 to contact WOLFE via telephone.

133. On October 20, 2024, CS-4 contacted WOLFE at telephone number (956) 243-0708. This telephone call was recorded by CS-4 and sent to case agents who then listened to the recorded telephone call.

134. CS-4 asked if WOLFE was going to be in the Brownsville, Texas area because CS-4 was thinking about coming to see WOLFE. WOLFE stated that he would be, and CS-4 asked if WOLFE "could still set me up with your boy." WOLFE asked, "What boy? Q?" CS-4 replied, "Yes." WOLFE answered, "Yeah, I could probably get you with Q." CS-4 told WOLFE that CS-4 would give WOLFE "That finders fee up front before I come out dude for fucking setting it up," and then stated, "Or if you want to do a cut on every single one I don't give a shit." WOLFE responded, "Yo, just let me know man, he's good people," and then stated, "better prices." Based upon their training, experience and familiarity with the investigation, case agents believe that CS-4 asked to be introduced to "Q" to conduct a future cocaine transaction ("Yeah, I could probably

46

get you with Q") and that WOLFE would receive a financial cut from the transactions by either CS-4 paying WOLFE before the transaction, or by providing WOLFE money on each kilogram of cocaine purchased from "Q" ("that finders fee up front before I come out dude for fucking setting it up") and ("or if you want to do a cut on every single one I don't give a shit.").

135. CS-4 asked, "So, Berto said fuck me or what? I ain't connecting with him?" Case agents believe that CS-4 wanted to confirm with WOLFE that HERNANDEZ did not want to meet with CS-4 ("So, Berto said fuck me or what? I ain't connecting with him?"). WOLFE stated, "Well Berto pretty much said fuck me too I haven't talked to him. He knows he burned you I guess. He didn't know, I didn't know if I knew that but I let him know I knew, now he kinda won't talk to me so..." Based on their training, experience and familiarity with the investigation, case agents believe that WOLFE informed CS-4 that WOLFE had not talked to HERNANDEZ, and that it was WOLFE's belief that HERNANDEZ knew that HERNANDEZ owed CS-4 money from the last failed transaction. Further, case agents believe that HERNANDEZ thought WOLFE knew about the failed transaction, and therefore, would not talk to WOLFE about meeting with CS-4 ("Well Berto pretty much said fuck me too I haven't talked to him. He knows he burned you I guess. He didn't know, I didn't know if I knew that but I let him know I knew, now he kinda won't talk to me so...").

136. CS-4 continued, "Yeah, I mean I just figured bro you know I worked with him already and shit dude. I know he burned me and shit but I was hoping he'd have some fucking heart just to fucking be able to be like yo bro, I know I fucked you over but let's do some shit, I'll give you a nice little discount or something dude, but sounds like he's not trying to play that part huh?" WOLFE replied, "Naw, he's all about fucking trying to get money for his family." CS-4 stated, "Yeah, well that shit sucks the way it played out, but you know it is what it is bro." Case

47

agents believe that CS- 4 indicated that CS-4 was disappointed that HERNANDEZ would not meet with CS- 4 to discuss the debt ("I was hoping he'd have some fucking heart just to fucking be able to be like yo bro, I know I fucked you over but let's do some shit, I'll give you a nice little discount or something dude."). Additionally, that WOLFE related to CS-4 HERNANDEZ was not interested in paying CS-4 back ("Naw, he's all about fucking trying to get money for his family.").

137.    CS-4 continued, "Umm, well dude I'm down for that bro, you want me to set up a fucking call with "Q" or I mean if Berto ain't gonna work with me bro, I'm gonna need another avenue, I mean I'm not getting any inventory like that out here you know what I'm saying? Or at least for those prices." Case agents believe that since HERNANDEZ would not meet with CS-4, CS-4 agreed to have WOLFE arrange a meeting with "Q" to obtain kilogram quantities of cocaine ("You want me to set up a fucking call with Q or I mean if Berto ain't gonna work with me bro, I'm gonna need another avenue, I mean I'm not getting any inventory like that out here you know what I'm saying? Or at least for those prices.").

138.    WOLFE responded, "Well I mean it's up to "Q" but "Q" ain't gonna want to just talk to anybody you know?" CS-4 acknowledged this information, and that WOLFE should talk to Q and get back to CS-4 on a three-way call or something similar. WOLFE asked, "Umm, yeah you trying to get the whole thing or like a half or what?" Based on their training, experience and familiarity with the investigation, case agents believe that WOLFE asked if CS-4 wanted a whole kilogram or half a kilogram of cocaine ("You trying to get the whole thing or like a half? "). CS-4 replied, "I mean if I can do a half to start, just to check it out bro and then I'll do one. I'll do one after that. Let me just test it out, send it to my people, make sure everything is Gucci, which I'm not saying it wouldn't be, but yeah, it's always nice to have that." Case agents further believe that CS-4 informed WOLFE that CS-4 would purchase a half of a kilogram of cocaine to test the quality

48

before purchasing a whole kilogram ("If I can do a half to start, just to check it out bro and then I'll do one, I'll do one after that."). WOLFE stated, "I get you, okay." CS-4 responded, "Set it up, let me know, and we'll go from there bro." WOLFE acknowledged, "Alright." Case agents instructed CS-4 not to pursue the potential transaction with WOLFE and "Q" at that time.

139.    On July 3, 2025, a Criminal Complaint was signed by the Honorable Stephen C. Dries, United States Magistrate Judge for the Eastern District of Wisconsin, charging Roberto HERNANDEZ and Darrius WOLFE with Possession with Intent to distribute, distribution of controlled substances and conspiracy to possess with intend to distribute and distribution of cocaine, a Schedule II controlled substance; and, aiding and abetting the aforementioned offenses. Federal arrest warrants were also signed by Judge Dries the same day.

140.    On July 15, 2025, HERNANDEZ was arrested at his residence, 3973 Rio De Janiero, Brownsville, Texas, on the outstanding federal arrest warrant. HERNANDEZ was found in possession of a purple-colored iPhone cellular smartphone **(Device "A")**, which was maintained as evidence. This iPhone is currently in possession of the Waukesha County Sheriff's Department – Waukesha County Drug Task Force, 515 W. Moreland Blvd., Waukesha, Wisconsin 53188.

141.    Also on July 15, 2025, WOLFE was arrested by agents with the United States Marshal's Service outside of the Great Wolf Lodge, 2500 Daniels Street, Manteca, California. A black Samsung cellular smartphone **(Device "B")** was located on WOLFE's person and was seized. This Samsung cellular smartphone is currently in possession of the Waukesha County Sheriff's Department – Waukesha County Drug Task Force, 515 W. Moreland Blvd., Waukesha, Wisconsin 53188.

49

142.     Based upon their familiarity with the investigation, case agents believe that the **Devices** contain evidence of the instant conspiracy and were used at various times during the commission of the crime.

### TECHNICAL TERMS

143.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard

50

drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer

51

programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

52

h.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

144.    Based on my training, experience, and research, I know that **Devices A and B** have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

145.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the Device.  This information can sometimes be recovered with forensics tools.

146.    There is probable cause to believe that things that were once stored on the **Devices A and B** may still be stored there, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

53

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

147. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **Devices A and B** were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on **Devices A and B** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration

54

information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

148. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **Devices A and B**

55

consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

149. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

150. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **Devices A and B** described in Attachment A to seek the items described in Attachment B.

56

## <u>ATTACHMENT A</u>

The property to be searched is described as follows:

      a.     A Purple and Pink iPhone smartphone, (item #2), hereinafter "**Device A;**"

      b.     A Black Samsung smartphone, (item #3), hereinafter **"Device B;"**

**Devices A and B**, collectively the "**Devices,**" are currently located at 515 W. Moreland Blvd., Waukesha, Wisconsin 53188. This warrant authorizes the forensic examination of the **Devices** for the purpose of identifying the electronically stored information described in Attachment B.

57

## ATTACHMENT B

1.      All records on the **Devices** described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, 18 U.S.C. § 2 including, but not limited to:

    a.   lists of customers and related identifying information;

    b.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c.   any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    d.   any information recording schedules or travel;

    e.   all bank records, checks, credit card bills, account information, and other financial records.

    f.   Photographs and/or video depicting possession of drugs; and

2.      Evidence of user attribution showing who used or owned **Devices A and B** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

58